IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

FREDERICKA NELLON and SOFIA
MONTANO,

                    Plaintiffs,

          v.

ZILLOW GROUP, INC.,

                    Defendant.

Civil Action No.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Fredericka Nellon and Sofia Montano, by and through undersigned counsel, seek a permanent injunction requiring a change in Zillow Group, Inc.'s ("Defendant" or "Zillow") corporate policies to cause the websites it owns, operates, or controls, to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

## INTRODUCTION

1.        In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf) (last accessed April 16, 2019).

2.    Fredericka Nellon is legally blind. Ms. Nellon was born prematurely and developed glaucoma as a result of her premature birth. She has been legally blind since age 14. She lost all sight after the birth of her daughter and is now totally blind. Today, Ms. Nellon uses screen readers, including the built-in Voiceover capability of her iPhone8 and computer, to navigate the internet.

3.    Sofia Montano is legally blind. Ms. Montano has retinitis pigmentosa, which is a group of inherited disorders that cause degeneration of the retina and vision loss. Ms. Montano has progressively lost her vision since childhood and is now blind. Today, Ms. Montano uses screen readers, including the built-in Voiceover capability of her iPhone, combined with JAWS and NVDA software, to navigate the internet.

4.    Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*. at *6-7. *See* American Federation for the Blind, *Screen Readers*, *available at* https://www.afb.org/node/16207/screen-readers (last accessed April 16, 2019) (discussing screen readers and how they work).

5.      According to Defendant, "Zillow Group houses a portfolio of the largest and most vibrant real estate and home-related brands on the web and mobile." *See* https://www.zillowgroup.com/about-zillow-group/ (last accessed April 16, 2019). "The company's brands focus on all stages of the home lifecycle: renting, buying, selling, financing and home improvement. Zillow Group is committed to empowering consumers with unparalleled data, inspiration and knowledge around homes, and connecting them with the right local professionals to help." *Id.* Zillow Group, Inc., is headquartered in Seattle, Washington.

6.      Defendant Zillow Group owns a portfolio of companies and websites which service the housing market. These websites provide information for consumers seeking to purchase, long term rental, short term rental, or obtain home lending services. Zillow Group owns and controls the following websites:

a.      www.zillow.com: "the leading real estate and rental marketplace dedicated to empowering consumers with data, inspiration and knowledge around the place they call home, and connecting them with the best local professionals who can help."

b.      www.trulia.com: "helps buyers and renters find a place where they will love to live. With insights sourced straight from locals and over 34 neighborhood map overlays like crime and schools, Trulia offers a deeper understanding of what living in a home and a neighborhood is really like."

c.      www.streeteasy.com: "New York City's leading local real estate marketplace, providing accurate and comprehensive for-sale and for-rent listings from hundreds

of real estate brokerages throughout New York City and the major NYC metropolitan area.

d. www.hotpads.com: "a map-based apartment and home rental search brand, and a top destination for renters in urban areas across the United States."

e. www.nakedapartments.com: "New York City's largest rentals-only platform, provides innovative tools and quality listings so renters can simply and quickly find their apartment, and makes it easier for brokers and landlords to connect with renters to fill available apartments faster."

f. www.realestate.com: "a home shopping brand, designed for first-time buyers and millennial home buyers."

g. www.outeast.com: "the ultimate online destination for Hamptons real estate, provides insider tips and locally penned guides that complement a hyper-customized shopping experience that lets buyers and renters search by town and see a home's proximity to beaches, farmers markets, transportation options, and other local points of interest."

h. www.zillowhomeloans.com: "a national provider of online mortgage lending services."

*See,* https://www.zillowgroup.com/about-zillow-group/, last accessed April 16, 2019. The websites listed above are collectively referred to herein as "Defendant's Websites" or "Websites."

7.     Zillow Group, through its portfolio of websites, provides an invaluable service to consumers seeking to rent or buy a home or apartment. Zillow's search capabilities allow consumers to easily narrow in on available homes and rentals, check for price history, compare nearby listings, and other home-related services, through the websites Defendant owns, operates,

and controls. *See* Zillow Group, About Us, *available at* https://www.zillowgroup.com/about-zillow-group/ (last accessed April 16, 2019).

8.     In addition to researching Defendant's home services from the comfort and convenience of their homes, consumers may also use Defendant's Websites to contact customer service by phone and email, review important legal notices like Defendant's Privacy Policy and Terms of Service, and research and apply for Defendant's home lending services. *See*, Zillow Group, About Us, *available* https://www.zillowgroup.com/about-zillow-group/ (last accessed April 16, 2019).

9.     Defendant is responsible for the policies, practices, and procedures concerning the Websites' development and maintenance.

10.    Unfortunately, Defendant denies approximately 8.1 million Americans who have difficulty seeing access to its Websites' goods, content, and services because the Websites are largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed April 16, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

11.    Plaintiffs bring this civil rights action against Defendant to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal

to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

12.     By failing to make its Websites available in a manner compatible with computer screen reader programs, Defendant, a public accommodation subject to Title III, deprives blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

13.     Because Defendants' Websites are not and have never been accessible, and because upon information and belief Defendant does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Websites to become and remain accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seek a permanent injunction requiring that:

    a) Defendant retain a qualified consultant acceptable to Plaintiffs ("Web Accessibility Consultant") who shall assist it in improving the accessibility of its Websites, including all third-party content and plug-ins, so the goods and services on the Websites may be equally accessed and enjoyed by individuals with vision related disabilities;

    b) Defendant work with the Web Accessibility Consultant to ensure that all employees involved in website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

    c) Defendant work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Websites may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d)   Defendant work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

e)   Defendant incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f)   Defendant work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Websites, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g)   Defendant directly link from the footer on each page of the Websites, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Websites to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Websites;

h)   Defendant accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i)   Defendant provide a notice, prominently and directly linked from the footer on each page of the Websites, soliciting feedback from visitors to the Websites on how the accessibility of the Websites can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)   Defendant provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Websites;

k)   Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Websites. Defendant shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l) Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Websites to be inaccessible to users of screen reader technology;

m) Plaintiffs, their counsel and their experts monitor the Websites for up to two (2) years after the Mutually Agreed Upon Consultant validates the Websites are free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendant.

14.    Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

15.    The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

16.    Defendant attempts to, and indeed does so, participate in the Commonwealth's economic life.

17.    Defendant's participation in the Commonwealth hinges, in significant part, on Massachusetts consumers, like Plaintiffs, accessing its Websites and using Defendant's products and services. Unlike, for example, a winery that cannot sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an online business open 24 hours a day, 7 days a week, 365 days per year to Massachusetts residents.

18.     As described in additional detail below, Plaintiffs were injured when they each respectively attempted to access Defendant's Websites from their respective homes in New Bedford, Massachusetts, but encountered barriers that denied each of them full and equal access to Defendant's online services.

19.     "Massachusetts has a strong and historic interest in adjudicating this dispute involving its blind residents. It is the home of the Perkins School for the Blind, which was America's first school for the blind. Helen Keller was taught there." *Access Now, Inc. v. Otter Products, LLC*, CV 17-10967-PBS, 280 F.Supp.3d 287, 294 (D. Mass. Dec. 4, 2017) ("*Otter Products*").

20.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

21.     Plaintiff Nellon is and, at all times relevant hereto, has been a resident of Bristol County, Massachusetts. Plaintiff Nellon is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.*

22.     Plaintiff Montano is and, at all times relevant hereto, has been a resident of Bristol County, Massachusetts. Plaintiff Montano is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.*

23.     Defendant is a Washington corporation with its principle place of business at 1301 Second Avenue, Floor 31, Seattle, Washington, 98101.

## FACTS APPLICABLE TO ALL CLAIMS

24.    While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

### DEFENDANT'S ONLINE CONTENT

25.    Defendant's Websites provide an invaluable service to consumers seeking to rent or buy a home or apartment. Zillow's search capabilities allow consumers to easily narrow in on available homes and rentals, check for price history, compare nearby listings, and other home-related services, through the websites Defendant owns, operates, and controls.

26.    In addition to researching Defendant's home services from the comfort and convenience of their homes, consumers may also use Defendant's Websites to contact customer service by phone and email, review important legal notices like Defendant's Privacy Policy and Terms of Service, and research and apply for Defendant's home lending services.

### HARM TO PLAINTIFFS

27.    Plaintiff Nellon attempted to access the Websites from her home in New Bedford, Massachusetts. Unfortunately, because of Defendant's failure to build its Websites in a manner that is compatible with screen reader programs, Plaintiff Nellon is unable to understand, and thus is denied the benefit of, much of the content and services she wishes to access on the Websites.

28.    Plaintiff Montano also attempted to access the Websites from her home in New Bedford, Massachusetts. Ms. Montano has struggled with using Zillow to find homes to rent for years and is currently experiencing the same accessibility issues. Ms. Montano believes Zillow

and its partner Websites are very useful sites and are her first choice to search available rentals locally. However, because the Websites are not accessible to the blind, it leaves her in the difficult position of needing someone with vision to help her navigate the Websites. In a market where homes are often rented quickly, the delay in being able to research and find homes due to the inaccessible Websites create timeframe issues and other difficulties.

29.     Plaintiff Nellon attempted to access the Websites using Apple's VoiceOver technology. Plaintiff Montano attempted to access the Websites using Apple's VoiceOver technology, combined with JAWS and NVDA software.

30.     VoiceOver is "a full-featured screen reader built into macOS that speaks the text in documents and windows, and describes aloud what appears on your screen…With VoiceOver, you control your Mac primarily with a keyboard, refreshable braille display, or trackpad. You use the VoiceOver cursor—which appears as a dark rectangular outline—to move around the screen, select buttons and other controls, and to read and edit text." *See* Apple, VoiceOver Getting Started Guide, *available at* https://help.apple.com/voiceover/info/guide/10.12/#/vo2681 (last accessed April 16, 2019).



*The VoiceOver cursor—a dark rectangular outline—focused on the word "Accessibility" on screen.*

This caption matches the alternative text that Apple provides in its VoiceOver Getting Started Guide. It illustrates the type of sufficiently descriptive alternative text that screen reader users require to fully and equally access Defendant's Websites.



31.     JAWS (Job Access with Speech) is a computer screen reader program for Microsoft Windows that allows blind and visually impaired users to read the screen wither with a text-to-speech output or by a refreshable Braille display. JAWS is the most popular screen reading technology (JAWS) currently on the market. JAWS reads to the user the content of the website as they navigate it with arrows.

32.     NVDA is a free, open source, globally accessible screen reader for the blind and vision impaired. It is created by NV Access, a charity which services vision-impaired persons. NVDA includes a built-in voice synthesizer and can be downloaded and transported on a USB drive. NVDA reads to the user the content of the website as they navigate it with a mouse or a braille keyboard.

33.     Unfortunately, after visiting Defendant's Websites from New Bedford, Massachusetts, and from investigations performed on their behalf, Plaintiffs found Defendant's Websites to be largely unusable due to various barriers that deny them full and equal access to Defendant's online content and services. For example, Plaintiffs' investigation discovered:

        a.     Defendant's Websites prevent visually impaired users from knowing what content on the websites is available to navigate. This is because there are no labels associated with the input fields. A screen-reader user will not get the proper context if placeholder text fails, is changed, or is not supported by a browser. This wholly prevents a screen reader user from properly using the search functions on the Websites to aid them in their home search. An

example of this can be found at https://www.zillow.com/foreclosures/ (last access April 16,

2019), and is shown below:



b.      Defendant's Websites contain material that is accessible to those with

vision, and is not accessible to the visually impaired. In particular, Defendant offers a "Home

Buyers Guide." The play button for this service is a link with no text. The play button will be

announced only as "link" making it very difficult for a visually disabled person to have any idea

where it leads. This can be found at, https://www.zillow.com/home-buying-guide/ (last accessed

April 16, 2019), and is shown below:



Videos, articles and tools to help you find your next home

34.     These barriers, and others, deny Plaintiffs full and equal access to all of the services the Websites offer, and now deter them from attempting to use the Websites. Still, Plaintiffs would like to, and intend to, attempt to access the Websites in the future to aid in their respective home searches, or to test the Websites for compliance with the ADA.

35.     If the Websites were accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiffs could independently research and utilize Defendant's products and access its other online content and services.

36.     Though Defendant may have centralized policies regarding the maintenance and operation of its Websites, Defendant has never had a plan or policy that is reasonably calculated to make its Websites fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

37.     The law requires that Defendant reasonably accommodate Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

38.     Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

## DEFENDANT'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS

39.     Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

40.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

## THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

41.     There is no DOJ administrative proceeding that could provide Plaintiffs with Title III injunctive relief.

42.     While the DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiffs with relief.

43.     Plaintiffs allege violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

44.     Resolution of Plaintiffs' claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Websites, and (b) whether Plaintiffs can access the content and services.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

45.     The assertions contained in the previous paragraphs are incorporated by reference.

46.     Defendant's Websites are a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Otter Products*, 280 F.Supp.3d 293, n.4 ("Several courts have held that a website can be treated as a public accommodation under Title III of the ADA."); *see also 1-800 Flowers.com*, 2018 WL 839381, *1 ("Defendant does not dispute that its websites are places of public accommodation subject to regulation by Title III of the ADA.").

47.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiffs with full and equal access to its Websites, it has violated the ADA.

48.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

49.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

50.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

51.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:   as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

52.     By failing to provide its Websites' content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

        (a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Websites;

        (b)     affording individuals with visual disabilities access to its Websites that is not equal to, or effective as, that afforded others;

(c)    utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)    denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)    failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

53.    Defendant has violated Title III by, without limitation, failing to make its Websites' services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Websites, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

54.    Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Websites to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

55.    Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's Websites or result in making the Websites different, but enables individuals with visual disabilities to access the Websites Defendant already provides.

56.    Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiffs and other individuals with visual disabilities.

57.    Plaintiffs' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

58.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiffs request relief as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Websites are fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Websites into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Websites are fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief Plaintiffs request is described more fully in paragraph 13 above.

(C)     Payment of actual, statutory, and punitive damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction.

Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) (same);

  (F)  Whatever other relief the Court deems just, equitable and appropriate; and

  (G)  An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: April 16, 2019    Respectfully Submitted,

        */s/ Jason M. Leviton*
        Jason M. Leviton (BBO# 678331)
        **BLOCK & LEVITON LLP**
        260 Franklin Street, Suite 1860
        Boston, MA 02110
        Phone: (617) 398-5600
        jason@blockesq.com

        Benjamin J. Sweet (*To be admitted Pro Hac Vice*)
        ben@sweetlawpc.com
        **THE SWEET LAW FIRM, P.C.**
        186 Mohawk Drive
        Pittsburgh, PA 15228
        Phone: (412) 742-0631

        Jonathan D. Miller (*To be admitted Pro Hac Vice*)
        jonathan@nshmlaw.com
        Alison M. Bernal (*To be admitted Pro Hac Vice*)
        alison@nshmlaw.com
        **NYE, STIRLING, HALE & MILLER, LLP**
        33 W. Mission Street, Suite 201
        Santa Barbara, CA 93101
        Phone: (805) 963-2345

        *Counsel for Plaintiffs, Fredericka Nellon and*
        *Sofia Montano*